FRANCISCO URBINA and
TINA WILLIAMS,

   Plaintiffs,

   v.

VILLAGE OF FOX LAKE,
DONALD SCHMIT, individually, and
PETER JAKSTAS, individually,

   Defendants.

No. 13 CV 8851

Judge Manish S. Shah

## MEMORANDUM OPINION AND ORDER

In April 2013, defendant Donald Schmit beat incumbent Edward Bender in the race for mayor of Fox Lake. On Schmit's second day in office, he fired Francisco Urbina and Tina Williams—two members of the prior administration and vocal supporters of the unsuccessful Bender re-election campaign. Urbina and Williams responded by bringing suit against Schmit, the Village of Fox Lake, and Peter Jakstas—a Fox Lake businessman alleged to have orchestrated plaintiffs' termination. In their 17-count complaint, plaintiffs Urbina and Williams allege violations of state and federal law, including claims for breach of contract, tortious interference, and violations of the First and Fourteenth Amendments.

Defendants now move under Rule 12(b)(6) to dismiss some, but not all, of plaintiffs' claims. For the following reasons, the Village's and Schmit's motions are granted, and Jakstas's motion is denied.

## I.  Legal Standard

"A motion under Rule 12(b)(6) tests whether the complaint states a claim on which relief may be granted." *Richards v. Mitcheff*, 696 F.3d 635, 637 (7th Cir. 2012). Under Rule 8(a)(2), a complaint must include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The short and plain statement under Rule 8(a)(2) must "give the defendant fair notice of what the claim is and the grounds upon which it rests." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quotation omitted). Under the federal notice pleading standards, a plaintiff's "[f]actual allegations must be enough to raise a right to relief above the speculative level . . . ." *Twombly*, 550 U.S. at 555. Put differently, a "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). "In reviewing the sufficiency of a complaint under the plausibility standard, [the court] accept[s] the well-pleaded facts in the complaint as true . . . ." *Alam v. Miller Brewing Co.*, 709 F.3d 662, 665-66 (7th Cir. 2013).

## II.  Background

In early 2013, plaintiffs Francisco Urbina and Tina Williams worked for defendant Village of Fox Lake. [1] ¶¶ 9-13. Urbina was the Village's building commissioner and Williams was an administrative assistant in the Building Department. *Id.* Both plaintiffs were strong and outspoken supporters of the incumbent mayor, Edward Bender. *Id.* ¶ 13. During and immediately after the 2013

mayoral election, Bender's opponent, Donald Schmit, made it publicly known that any Fox Lake employee who strongly supported Bender's re-election would be terminated once Schmit was elected. *Id*. ¶ 42.

One of Schmit's supporters, defendant Peter Jakstas, owned and operated a historic hotel and restaurant called the Mineola. *Id*. ¶ 190. In April 2011, then-Mayor Bender asked Urbina to inspect the Fox Lake landmark, during which Urbina found safety violations requiring it to be shut down. *Id*. ¶¶ 193-94. Jakstas angrily blamed Bender, Urbina, and Williams not only for this closure of his business, but also for the death of his daughter, who had been operating the Mineola until it was closed. *Id*. ¶¶ 196, 198-99. Thus, when Schmit chose to run for mayor of Fox Lake, Jakstas agreed to support him financially in exchange for Schmit agreeing to fire Urbina and Williams once he was in office. *Id*. ¶¶ 204-05.

Schmit won the election in April 2013 and was sworn in on May 14, 2013. *Id*. ¶ 44. Schmit fired plaintiffs shortly thereafter, appointing a campaign supporter, David Thomey, to replace Urbina as the Village's building commissioner. *Id*. ¶¶ 45, 55-56.

At the time plaintiffs lost their jobs, Fox Lake had the following ordinances in effect (Ord. 1-8-4(A), (C)):

> A.    Term Of Office; Appointed Officials: Unless otherwise provided by ordinance, each appointed officer in the village shall hold office for a term of one year or until his successor is appointed and qualified. Unless otherwise provided, the term of each office will expire on April 30 following the appointment, but at the pleasure of the president and board of trustees, an appointed official may continue in office beyond April 30 until his successor is appointed and qualified.

[. . .]

C.      Removal:

1.      Employees Generally: The board of trustees by majority vote may dismiss an employee at any time for just cause. An employee who is dismissed shall be given written notice of the reasons for the action, copies of which shall be forwarded to the president and village clerk.

2.      Appointed Official: The president shall have the power to remove any appointed official or employee on formal charge whenever he shall be of an opinion that the interests of the village shall demand such a removal. He shall report the reasons for such removal to the board at a meeting thereof to be held not less than five (5) days nor more than ten (10) days after such removal. If the president shall fail or refuse to file with the village clerk a statement of the reasons for the removal, or if the board, by two-thirds (2/3) vote of all its members authorized by law, should disapprove such removal, such official or employee shall thereupon be restored to the office from which he was removed. No official shall be removed a second time for the same incident.

Schmit did not follow these procedures when he terminated plaintiffs. [1] ¶¶ 50-54.

Plaintiffs filed a 17-count complaint alleging first-amendment retaliation, denial of due process, breach of contract, wrongful termination, tortious interference, and failure to pay accrued vacation time. Defendants now move to dismiss under Rule 12(b)(6), with Jakstas moving as to all counts against him, Schmit moving as to Counts I, III, IX, and XI,[1] and the Village moving as to Counts I through V, and VII.

---

[1] Schmit's motion also purports to move as to Count IV, [22] at 1, but Schmit offers no argument in support of dismissing that count.

## III.    Analysis

### A.    Counts I-IV (Against the Village)

In Counts I and II, plaintiffs say the Village fired them as payback for their support of Bender's re-election campaign, thereby violating their rights under the First Amendment. In Counts III and IV, plaintiffs claim the Village violated their fourteenth-amendment due process rights by firing them without a pre- or post-termination hearing. Plaintiffs bring these four counts under 42 U.S.C. § 1983.

A municipality may be liable for a constitutional tort only if the injury was caused by its policy or custom. *See Monell v. Department of Social Services of the City of New York*, 436 U.S. 658, 694 (1978). A plaintiff can demonstrate the existence of municipal policy or custom by showing either an express policy, a widespread practice constituting custom or usage, or an action taken by a person with final policymaking authority. *See McTigue v. City of Chicago*, 60 F.3d 381, 382 (7th Cir. 1995). Here, plaintiffs pursue only the "final policymaking" method of demonstrating municipal policy. [34] at 5-11.

State and local law determine whether an officer has final policymaking authority with regard to a specific issue. *See Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986). Final policymaking authority can be granted directly by statute, or it can be delegated by someone to whom it was directly granted. *See Kujawski v. Board of Commissioners of Bartholomew County*, 183 F.3d 734, 737 (7th Cir. 1999). Where a final policymaker unofficially delegates policymaking authority to another, the latter becomes the *de facto* final policymaker and his actions will constitute

policy. *See Valentino v. Village of South Chicago Heights*, 575 F.3d 664, 677-78 (7th Cir. 2009).

Plaintiffs' constitutional claims against the Village are based on the theory that Schmit had final policymaking authority for Fox Lake on personnel decisions. The Village Code makes clear, however, that the Village Board of Trustees holds final say in the termination of both employees (like Williams) and appointees (like Urbina). *See* Ord. 1-8-4-(C) (quoted in-full above). Section 1-8-4-(C)(1) authorizes the Board alone to terminate Village employees. Likewise, while section 1-8-4-(C)(2) does grant the mayor the authority to remove appointees, such removals are subject to review by the Board. Thus, as a matter of local law, the Board—not the mayor— holds final policymaking authority on Village personnel decisions. *See City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988) ("[T]he authority to make municipal policy is necessarily the authority to make *final* policy. . . . [W]hen a subordinate's decision is subject to review by the municipality's authorized policymakers, they have retained the authority to measure the official's conduct for conformance with *their* policies.") (emphasis in original, citations omitted).

Plaintiffs argue that even if the Board was originally granted the power in question, the complaint alleges Schmit was delegated such authority and thus he constitutes the *de facto* final policymaker. *See* [34] at 7. While this argument correctly states the law, the complaint does not actually say what plaintiffs say it does. They cite to two paragraphs in support of their delegation argument, and each one states only that "Under Schmit's leadership and authority, the Village of Fox

Lake adopted a policy, custom or practice of 'ring out the old and promote the new' and was used to implement Schmit's purge of the Building Department." [1] ¶¶ 73, 90. Even construing this allegation in the light most favorable to plaintiffs, it cannot be reasonably read to allege that the Fox Lake Board of Trustees delegated to Schmit its exclusive legal right to terminate employees and appointees. Although plaintiffs do allege elsewhere that "Mayor Schmit is a final policymaker responsible for overseeing municipal operations in Fox Lake," *id.* ¶ 19, these conclusory allegations are insufficient. Because plaintiffs do not properly allege that their constitutional injuries were caused by a Village policy or custom, they fail to state a constitutional claim against Fox Lake.

The Village's motion is granted as to Counts I, II, III, and IV.

## B.     Count I (Against Schmit)

Urbina also brings Count I against Schmit, similarly claiming the mayor fired him as payback for supporting Bender's re-election campaign. The First Amendment generally forbids government officials from discharging public employees solely for not supporting a political victor. *See Rutan v. Republican Party of Illinois*, 497 U.S. 62, 64 (1990). Nevertheless, a public official may be terminated on the basis of political affiliation if her position is a policymaking one. *Davis v. Ockomon*, 668 F.3d 473, 477 (7th Cir. 2012). A policymaking position is one that authorizes meaningful input into government decision making on issues that present room for principled disagreement on goals or implementation. *Id.*

"The question of whether a position is exempted from the First Amendment patronage dismissal ban [because it is policymaking] is a factual one that should ordinarily be left for a jury to determine." *Pleva v. Norquist*, 195 F.3d 905, 912 (7th Cir. 1999). But where a position's duties and responsibilities are clearly defined by law, the court may make the determination instead. *Id.*; *Ockomon*, 668 F.3d at 478; *see also Warzon v. Drew*, 60 F.3d 1234, 1240 (7th Cir. 1995) (district court's determination of plaintiff's policymaking status on Rule 12(b)(6) motion was proper). When conducting this analysis, the court should examine "the powers inherent in a given office, as opposed to the functions performed by a particular occupant of that office." *Kiddy-Brown v. Blagojevich*, 408 F.3d 346, 355 (7th Cir. 2005) (quotation omitted).

In assessing the powers of an office, the court first looks to how much discretion it bears. The more discretion, the more likely the office can make policy. *Embry v. City of Calumet, Illinois*, 701 F.3d 231, 236 (7th Cir. 2012) ("when an employee exercises broad discretionary power, the state cannot easily fire the employee for insubordination even though the employee's performance frustrates the implementation of the administration's policies.") (quotation omitted). The court also considers how the office is filled. *Id.* For example, if time limits allow new administrations to appoint new individuals upon taking office, it becomes more likely that the office is a policymaking one. *Id.* at 236-37.

Schmit argues that the Fox Lake building commissioner has the authority to make policy because the powers and duties set forth in section 1-9-3-3(B), "involv[e]

the exercise of discretion and judgment, are policy oriented and in certain circumstances could be considered politically sensitive." [23] at 8-9. The cited section states (Ord. 1-9-3-3(B)):

1. [The building commissioner] shall be in charge of the building department, and it shall be his duty to see to the enforcement of the provisions of all ordinances relating to building and zoning.

2. He shall inspect all buildings or structures being erected or altered as frequently as may be necessary to ensure compliance with the village ordinances, and shall supervise the activities of the electrical inspector, plumbing inspector or any other inspectors appointed to his department.

3. The building commissioner shall have the power to enter at any reasonable hour into any building or premises where the work of altering, repairing or construction of any building or structure is going on, for the purpose of making inspections.

4. The building commissioner shall have the power to issue occupancy permits. There shall be no occupancy upon the building until an occupancy permit has been issued.

Other portions of the Village Code grant the building commissioner additional discretionary powers. For example, section 6-2-6(A) gives him discretion to determine when the Village's housing regulations have been violated. Section 6-2-2(A) empowers him to determine if a building is "unfit for human habitation," thereby resulting in the building needing to be vacated. Section 6-2-2(B) charges the commissioner with deciding whether building "defects or violations have been remedied," such that people can re-enter vacated premises. And section 6-7-4(C) affords him "broad discretion" to determine whether any fence built around any property in the Village allows for sufficient visibility.

Other ordinances give the building commissioner authority to directly and indirectly affect formal Village policy. For example, the building commissioner is permitted to make rules and regulations governing the demolition or relocation of buildings. Ords. 6-3-6; 6-3A-5. He must also submit a written recommendation on whether the Village should vacate any of its streets or alleys. Ord. 7-1C-3. And "[i]f a discrepancy exists between or among differing principles and standards required by [the article on construction of utility facilities in the rights of way,] the building commissioner shall determine, in the exercise of sound engineering judgment, which principles apply and such decision shall be final." Ord. 7-1D-13(B)). Finally, the building commissioner, in addition to enforcing existing zoning regulations, is required to "[i]nitiate, direct and review, from time to time, a study of the provisions of [the zoning] ordinance and make reports of [his] recommendations to the zoning board of appeals not less than once a year." Ord. 9-1-6-2.

In light of all these enumerated powers and duties, I conclude that the position of Fox Lake building commissioner "authorizes meaningful input into government decision making on issues that present room for principled disagreement on goals or implementation." *Ockmon*, 668 F.3d at 477. The building commissioner has wide discretion to enforce Fox Lake's housing regulations. For example, he could decide as a matter of principle that anything less than perfect compliance with the housing regulations is "reasonable grounds" to condemn the building. Such a philosophy would most assuredly protect the health and safety of Fox Lake's residents and visitors, but it would also likely do so at the expense of the

Village's homeowners, building owners, and businesses. Conversely, the building commissioner could adopt the arguably more business-friendly approach of allowing buildings to remain legally habitable despite imperfect compliance, so long as he felt the buildings were "safe enough."

The events surrounding the Mineola Hotel provide a good example of the political stakes at play in the office of the building commissioner. If the political goals of the mayor's administration are furthered by allowing a historic landmark business to continue to operate—say because the mayor was elected on a pro-business, pro-tourism platform—the building commissioner is in a position to thwart the mayor's goals. *See* Ord. 6-2-2(A) ("Whenever *in the opinion of the building commissioner*, there are reasonable grounds to believe that any building is so damaged, decayed, dilapidated, unsanitary, unsafe or vermin infested that it creates a serious hazard to the health or safety of the occupants, if any, to persons who might enter therein or to the public in general, he shall declare such building unfit for human habitation and shall so placard the building.") (emphasis added).

My conclusion that the building commissioner is a policymaking position is further supported by the fact that the appointment is for a term of one year and coincides with the mayoral election. "Such time limits allow new administrations to appoint new commissioners upon ascension to office, freeing them from the burden of appointees loyal to the previous administration." *Embry*, 701 F.3d at 236-37.

Urbina argues that (1) he "explicitly alleged that he was not involved in setting policy," and (2) "his job amounted to inspecting buildings in Fox Lake and

reviewing whether buildings were in compliance with local, state and federal requirements." [34] at 18. These arguments are ineffective, however, because the present inquiry looks at the position as a matter of law based on the Village Ordinances, and not based on Urbina's allegations of how he filled the role.

Schmit's motion is granted as to Count I.

C.    **Count III (Against Schmit)**

In Count III, Urbina alleges that Schmit violated his right to procedural due process by terminating him without a pre- or post-termination hearing. No state may deprive any person of property without "due process of law." U.S. Const. amend. XIV, § 1. "'[T]he root requirement' of the Due Process Clause [is] 'that an individual be given an opportunity for a hearing before he is deprived of any significant property interest.'" *Cleveland Board of Education v. Loudermill*, 470 U.S. 532, 542 (1985) (quoting *Boddie v. Connecticut*, 401 U.S. 371, 379 (1971)). Thus, in this context, the due process clause is triggered only if the plaintiff had a significant property interest to begin with. *See Board of Regents v. Roth*, 408 U.S. 564, 569-70 (1972).

To establish a property interest in continuing governmental employment, a plaintiff "must have more than an abstract need or desire for it[;]" rather, he must prove "a legitimate claim of entitlement" to continued employment. *Id*. at 577. A legitimate entitlement to governmental employment can be created in essentially two ways: (1) "by an independent source such as state law securing certain

benefits"; or (2) by a "clearly implied promise of continued employment." *See Munson v. Friske*, 754 F.2d 684, 692 (7th Cir. 1985).

Urbina believes Village Ordinance 1-8-4 gave him a legitimate claim of entitlement to continued employment. As he reads it, the ordinance entitled him to continue in his position until either his successor was appointed and qualified, or he was terminated consistent with the terms of section 1-8-4(C)(2). [34] at 12. Since neither of these conditions were met, Urbina argues, he had a legitimate claim of entitlement to continued employment.

Urbina's reading of section 1-8-4(A) ignores the provision's explicit requirement that employment beyond April 30 be "at the pleasure of the president and board of trustees . . . ." According to the complaint, Schmit caused plaintiff to discontinue serving as building commissioner on May 15, 2013. [1] ¶¶ 44-45. The only possible inference from this allegation is that Urbina's continued post-April 30 service was not at the pleasure the president. Since Urbina had been neither reappointed for an additional one-year term, nor allowed—at the pleasure of the president—to continue as a temporary holdover officer, he had no legitimate claim of entitlement to the position of building commissioner. *See Wolf v. City of Fitchburg*, 870 F.2d 1327, 1331-32 (7th Cir. 1989) (mere "holdover treasurer" had no constitutionally protected interest in the position). Because Urbina had no constitutionally protected interest in his position, his termination did not trigger the Due Process Clause.

Further, section 1-8-4(C)(2) applies to appointees who are removed during their terms, but not to holdover officers. If holdover officers could be removed only subject to the Board's review, the holdover officer's post-April 30 service could not reasonably be characterized as "at the pleasure of the president," as section 1-8-4(A) requires.

Schmit's motion is granted as to Count III.

### D.     Counts V and VII

In Count V, Urbina alleges the Village wrongfully terminated him by firing him without following the procedures contained in section 1-8-4(C)(2). In Count VII, Urbina alleges the Village breached his contract of employment (which was created by section 1-8-4(C)(2)) by terminating him without following the procedures contained in section 1-8-4(C)(2). As an initial matter, Illinois law does not appear to recognize any cause of action called "wrongful termination" that is independent of an employment contract. Thus I take Counts V and VII as alleging a single claim that (1) section 1-8-4 controlled Urbina's employment relationship with the Village, (2) the Village breached section 1-8-4, and (3) that breach caused Urbina damage.[2]

At the time Urbina was terminated, he was a holdover officer not subject to the requirements of section 1-8-4(C)(2). *See* III.C, *supra*. Accordingly, the Village was not required to follow those provisions in removing Urbina, and its failure to do so was not a breach of an employment contract or a wrongful termination. Likewise,

---

[2] Portions of Urbina's complaint and response brief suggest his "wrongful termination" claim is one for violations of his right to procedural due process. *See, e.g.*, [1] ¶ 120(a); [34] at 11-13. To the extent that is so, the claim duplicates Count III and fails for the same reasons.

section 1-8-4(A) did not protect Urbina from being terminated. Instead, it merely *allowed* him—at the pleasure of the president and Board—to remain in his position until a successor was appointed and qualified. I do not read section 1-8-4(A), as Urbina does, to mean that Urbina was *entitled* to keep his job until a successor was appointed and qualified.

Finally, any reliance by Urbina on the Village's Employee Policy Manual is misplaced since the document explicitly states that "[n]either this handbook nor any other Village document, confers any contractual right, either express or implied, to remain in the Village of Fox Lake's employ." [34-2] at 5.

The Village's motion is granted as to Counts V and VII.

## E.    Counts IX and XI

In Count IX, Urbina alleges Schmit tortiously interfered with his employment by disregarding the terms of section 1-8-4(C)(2) and unilaterally firing him. In Count XI, Urbina alleges Schmit tortiously interfered with his prospective economic advantage by terminating him. As a threshold matter, Illinois law considers tortious interference with employment to be a type of tortious interference with prospective economic advantage, in which the advantage at issue is continued employment. *See Fellhauer v. City of Geneva*, 142 Ill. 2d 495, 510-11 (1991); *Harrison v. Addington*, 2011 IL App (3d) 100810 ¶ 52 (3d Dist. 2011); *see also Ali v. Shaw*, 481 F.3d 942, 944-45 (7th Cir. 2007). Urbina implicitly acknowledges this in his brief. *See* [34] at 25 ("Urbina expected to remain employed and enjoy the

prospective economic benefit from his employment . . .”). I therefore treat Urbina’s two claims as one.

To state a claim for tortious interference with the prospective economic advantage of continued employment, a plaintiff must allege that: (1) he had a reasonable expectation of continued employment; (2) the defendant knew of the expectation; (3) the defendant’s intentional and unjustified interference caused the termination of the employment; and (4) damages. *Harrison*, 2011 IL App (3d) 100810 ¶ 52. If, in firing the plaintiff, the defendant was a public official exercising his right to terminate employment for a public position, the plaintiff’s claim can survive only if he pleads that the defendant was acting maliciously or without justification. *See Fellhauer*, 142 Ill. 2d at 513; *Mann v. City of Chicago*, 74 F.3d 1242, 1996 WL 23405, *3 (7th Cir. 1996) (table). So long as the defendant was acting in good faith for the benefit of the public, he is immune from liability for this tort. *Id*. A defendant acts without justification or maliciously if (1) his behavior was intended solely to harm the plaintiff, or (2) the conduct was taken solely for the defendant’s own gain and contrary to the best interests of the public. *Mann*, 74 F.3d at *4.

Counts IX and XI fail because Schmit was a public official exercising his right to terminate employment for the position, and Urbina does not allege that Schmit failed to reappoint him maliciously or without justification. To the contrary, Urbina alleges that Schmit did not reappoint Urbina because he instead wanted to install officers who would be friendly to the new administration. [1] ¶¶ 42, 55-56, 60.

Hiring political allies to fill policymaking positions, such as the building commissioner, is a non-malicious and justified basis for terminating a prior officer.

Schmit's motion is granted as to Counts IX and XI.

## F.    Counts XIII-XVI

In Counts XIII through XVI, Urbina and Williams allege that Jakstas tortiously interfered with their employments and prospective economic advantages. Like before, I construe these counts as alleging a single theory of liability for tortious interference with the prospective economic advantage of continued employment.

Jakstas provides a number of arguments in favor of dismissing these four counts. First, he argues that plaintiffs have failed to plead a reasonable expectation of continued employment. I disagree. Plaintiffs alleged that the Village and building department "had always employed individuals irrespective of any election cycle or Mayoral term of office." [1] ¶¶ 28, 31. For example, the complaint states that Urbina's predecessor served under at least five different mayors. *Id*. Likewise, Williams "continued in her employment without any need for rehire or reappointment from 2005-2013 while three (3) different individuals served as Mayor prior to Schmit."[3] *Id*. ¶ 29. Based on these historical practices, it is not implausible that plaintiffs reasonably expected to keep their jobs even if Schmit won the election, nor is the theory precluded as a matter of Illinois law. *See Fellhauer*, 142

---

[3] Nothing in the complaint suggests that the size of the Building Department changed at all over the course of three administrations in which Williams worked. Thus, I reject Jakstas's argument that it was unreasonable for Williams to expect to continue working due to the small size of the building department. *See* [37] at 5-6.

Ill. 2d at 512 (making clear that holdover employees, at-will employees, and fixed-term employees can all have "a legitimate expectancy in an employment relationship.").

Schmit's promise to fire Bender supporters, or Thomey's frequent presence at the Village Board Office, did not make plaintiffs' expectations unreasonable. This activity is alleged to have taken place *after* Jakstas had already interfered with plaintiffs' employment statuses by entering into an agreement with Schmit.

Jakstas argues that plaintiffs do not plead that he caused Schmit to fire Urbina and Williams. [37] at 7. Jakstas acknowledges the complaint does in fact allege causation, but he contends other allegations show Schmit would have fired plaintiffs no matter what. Specifically, Jakstas points out that "(i) Thomey had been a strong supporter of Schmit; (ii) Bender had a close working relationship with Plaintiffs; (iii) Plaintiff were strong supporters of Bender's re-election; and (iv) Schmit made no secret of the fact that, upon his election, he intended to fire Fox Lake employees who strongly supported Bender's re-election campaign." *Id*. Again, these allegations are not inconsistent with plaintiffs' theory, because the alleged tortious conduct pre-dated these events.[4]

Jakstas argues that plaintiffs' claims should be dismissed because they do not allege that "they made an attempt to have the trustees overturn Schmit's decision[s.]" [37] at 8. Jakstas acknowledges that this mitigation of damages

---

[4] Jakstas argues that Urbina's claims should be dismissed because Schmit actually did follow section 1-8-4(C)(2) in terminating Urbina. [37] at 8. Even if I could infer that Schmit fully complied with section 1-8-4(C)(2)—a disputed fact at this stage—Jakstas does not explain why this would permit him to tortiously interfere with Urbina's employment by extracting a promise from Schmit to fire Urbina.

argument is an affirmative defense, and so not usually grounds for dismissal under Rule 12(b)(6). *Brownmark Films, LLC v. Comedy Partners*, 682 F.3d 687, 690 (7th Cir. 2012). Nevertheless, he believes it merits dismissal in this case because "Plaintiffs base their claims against Jakstas in part on Fox Lake Ordinance: 1-8-4(C)(2), which in effect permits an officer or employee to ask the trustees for reinstatement." [37] at 8. While Jakstas cites to a handful of cases, *see* [37] at 8-9, none of them says a complaint should be dismissed for failing to plead mitigation of damages. Nor are the cited cases otherwise on point. *See Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998) (outlining employer's affirmative defense to claims of supervisory liability under Title VII); *Wehrs v. Wells*, 688 F.3d 886, 893 (7th Cir. 2012) (discussing waiver of mitigation defense in the context of a default judgment); *Santana v. Cook County Board of Review*, 679 F.3d 614, 620-21 (7th Cir. 2012) (reviewing dismissal of § 1983 and RICO claims without consideration of any affirmative defenses). Thus, I decline to depart from the default rule that a plaintiff need not negate affirmative defenses in her complaint. *Stuart v. Local 727, International Brotherhood of Teamsters*, 771 F.3d 1014, 1018 (7th Cir. 2014).

Finally, Jakstas argues that the claims against him should be dismissed because his alleged conduct was protected by the First Amendment. Jakstas supports this argument with a handful of citations to and quotations from *Citizens United v. Federal Election Commission*, 558 U.S. 312 (2010) and *McCutcheon v. Federal Election Commission*, -- U.S. --, 134 S.Ct. 1434 (2014). *See* [37] at 9; [50] at 5-6. Jakstas does not explain, however, how the holdings of these cases support his

conclusion. The argument is insufficiently developed. *See F.T.C. v. World Media Brokers*, 415 F.3d 758, 766 (7th Cir. 2005) ("Perfunctory or undeveloped arguments are waived.") (quotation omitted). In any event, both cases make clear that first-amendment protections do not extend to *quid pro quo* arrangements, and that is exactly what plaintiffs allege happened here. *See, e.g.*, [1] ¶ 205 ("Schmit's agreement to terminate Urbina and Williams was the *quid pro quo* for Jakstas' financial and political support of Schmit."). Further, I disagree with Jakstas that plaintiffs' *quid pro quo* theory is merely speculative and not plausible. It is wholly plausible to believe that Jakstas agreed to finance Schmit's campaign on the condition that Schmit terminate those responsible for both shuttering Jakstas's business and precipitating his daughter's death. While the facts may not bear this theory out, the theory may stand for now.

Jakstas's motion is denied as to Counts XIII through XVI. [5]

---

[5] Jakstas adopted a number of his co-defendants' arguments. *See* [37] at 9. However, for the reasons already given, none of these arguments warrants dismissal of plaintiffs' claims against Jakstas.

# IV. Conclusion

Defendant Village of Fox Lake's motion to dismiss [19] is granted. Defendant Donald Schmit's motion to dismiss [22] is granted. Defendant Peter Jakstas's motion to dismiss [36] is denied. Counts I, II (as to the Village), III, IV (as to the Village), V, VII, IX, and XI are dismissed. Counts II (as to Schmit), IV (as to Schmit), VI, VIII, X, XII, XIII, XIV, XV, XVI, and XVII remain in the case.

ENTER:

_____
Manish S. Shah
United States District Judge

Date:  1/5/15